EXHIBIT A

Declaration of Yuhan Liu

In Support of Motion for Temporary Restraining Order

The full scope of Plaintiff's harm is described in the accompanying Declaration of Irreparable Harm and Institutional Misconduct (Exhibit A), which outlines documented psychological deterioration, hospitalization, retaliatory administrative actions, and systemic failures that prevented timely academic completion.

Statement of Irreparable Harm and Institutional Failure

I have experienced long-standing, severe anxiety in academic environments, especially in interactions with professors or authority figures from certain cultural backgrounds. These challenges have been formally documented in both my SLDS accommodation letters and medical records, and they have significantly impaired my ability to function in conventional classroom settings.
When I requested an alternative method to complete the course, the instructor failed to respond clearly. Even after the undergraduate office of my college intervened, the situation remained unresolved. As graduation approached, the uncertainty triggered overwhelming psychological stress.

I sought help through every official channel: first my academic advisor, who could not offer a clear solution; then the assistant director, who, like the instructor, failed to provide a concrete path forward. Prolonged silence and a lack of accountability only worsened my condition. Eventually, I turned to the assistant dean—after reviewing OSU's own support policies—only to be redirected again back to the assistant director, who told me to speak with my advisor and SLDS once more.

However, SLDS had already explained that they were unable to arrange a final exam due to the late approval of my Flex Plan, and that any completion plan would require instructor cooperation. Meanwhile, the assistant dean had explicitly declined to intervene. I was trapped in a cycle of institutional deflection where no one took responsibility or offered a viable solution. The more I followed official

页 28

procedures, the more I felt ignored, invalidated, and ultimately left in despair.

What deepened my anxiety further was the sheer confusion about whom to contact next. The university has no published protocol for escalating unresolved accommodation failures. I had to search OSU's website myself to even find that the assistant dean might be the appropriate contact. Still, I had no idea which one, or whether I was following the correct process. When I finally drafted my request email, I was paralyzed with fear—afraid I would be bothering someone or saying something wrong.

Eventually, I realized I could no longer wait. Inaction would mean forfeiting graduation. Despite my fear, I reached out—because I had no other choice. That moment of action, taken amid uncertainty, reflected the urgency and helplessness I had been carrying all semester.

At the same time, I was under immense academic and personal pressure. I was enrolled in 24 credit hours (18 at OSU, 6 through external coursework) while managing multiple graduate school applications, including standardized tests, essay submissions, video interviews, and long periods of uncertainty. Weekly midterms, quizzes, and writing deadlines compounded the stress. The prolonged deadlock in MATH 4548, and the college's refusal to act, severely heightened my anxiety and sense of isolation.

My SLDS accommodations explicitly include timely access to class notes. However, the instructor in this course stated that he only teaches via chalkboard and does not provide any slides, notes, recordings, or review materials on Carmen. For a student with anxiety-related accommodations, this lack of structural support makes learning exceptionally difficult.

In mid-April, after the undergraduate office contacted the instructor on my behalf, I was sent the second midterm exam—but with no explanation, no supplemental material, and no plan for what came next. When I followed up, the instructor stated that because my request was submitted too late, the final exam could not be uploaded to SLDS. I would have to take it in the regular classroom. However, by that time, both my Course Accessibility Letter and Flex Plan had been approved. SLDS clarified that further arrangements required instructor cooperation—but no alternative plan was offered.

Although I did not activate my MATH 4548 accommodations at the

beginning of the semester, I have had official SLDS documentation since 2023. I had hoped to complete the course without accommodations. But as my condition worsened, I was forced to request formal support. SLDS approved the request promptly, but even now, no viable completion plan has been provided.
I followed every official process, contacted every relevant department, and still was not given any way to complete the course. I became trapped in a loop of one office approving, another deflecting, and the only person with decision-making authority refusing to act.
On April 15, I experienced a severe panic attack. I cried uncontrollably, experienced convulsions, chest pain, nausea, and difficulty breathing. After about an hour, I stabilized enough to go to the hospital for medication.

Even as I was panicking, crying, and struggling to breathe, I kept writing. I kept writing because I was terrified that if I stopped—even for a day—I would be forgotten. That my silence would be taken as agreement.

I remember sitting in my room, barely able to hold my phone steady, typing with shaking hands. My chest was tight, my head was pounding, and yet I was still writing—emails, declarations, timelines, anything—to prove that I was still here.

I was not writing because I was okay. I was writing because I wasn't, and I didn't want to disappear.

Moreover, on April 17 It is possible that Dr. Jones simply did not have the time to read my messages in full—or that my words were misunderstood, despite being repeated multiple times. However, given his background as a PhD in English, I believe that

had he carefully read even a single full message from me, he would have clearly understood what I was asking for. Dr. Jones's professional biography highlights a strong commitment to supporting underrepresented communities and amplifying student voices. I trust that, had he been fully aware of the extent of my situation, his response might have reflected those values. It is possible that the urgency and substance of my request were not fully recognized amid the volume of communications he receives. Either way, the result has been the same: no one has taken responsibility, and no viable solution has been offered.

Then, on April 17 — a day I will never forget — I was blocked by the Vice Provost, who told me I would receive no further response

because I had escalated the matter to the university president. He had already received detailed medical documentation indicating that I

was in psychological crisis and at risk of hospitalization. I had informed multiple university officials, including Dr. Jones, that I had experienced a severe panic attack and was seeking emergency care. His response — refusing all future contact — was not a matter of misunderstanding. It was a deliberate choice, made with full awareness of the consequences.

After this initial incident, I noticed that he later unblocked my account temporarily, perhaps due to internal pressure or procedural caution. However, shortly after the Ohio Civil Rights Commission formally notified the university of its investigation, Dr. Jones blocked me again, cutting off all communication. This second act of disengagement — carried out in direct response to a formal civil rights investigation — strongly suggests retaliatory intent. His decision to block me not once, but twice, amidst ongoing legal and medical escalation, reflects a knowing refusal to fulfill institutional duties. Yet even then, no one else offered a viable solution. Every department continued redirecting me to individuals with no authority, using the same scripted language. I even compiled a chart documenting the university's circular responses — but nothing worked.

After that, I noticed a shift in tone across departments—perhaps I was being overly sensitive—but even unrelated Flex Plan approvals for other courses were suddenly delayed. Normally, these are processed within a day. SLDS and my instructors had previously agreed to reschedule my STAT 4202 quiz due to my emergency room visit, but that too was now blocked. Not until that Friday—after the Ohio Department of Higher Education advised me to escalate to the Board of Trustees—did things start moving again. Suddenly, SLDS and the quiz were addressed. I realized the Vice Provost's message may have influenced others not to help me. That Friday, in a state of desperation, I sent out over 40 emails: to media outlets, legal organizations, advocacy groups, legislators, and civil rights offices. I felt completely alone. I was terrified. When even SLDS—a place meant to protect students like me—became a source of fear, I began searching for legal counsel.

I contacted many attorneys and legal aid organizations. Some showed genuine concern and compassion, telling me my situation was deeply unjust. A few even used their internal referral networks to connect me with education or disability lawyers. But again and again, I ran

into walls — many told me directly that my case was "too complicated" or "too resource-intensive" for them to take.

页 31

Others declined due to conflicts of interest, such as existing ties to the university or overlapping cases. One disability rights attorney even said, "Your case is important — but it's institutionally messy."

Every time someone tried to help, they eventually reached a limit — and I was passed along again. It became clear that the legal system, like the university system, had barriers of its own. What hurt the most was that I wasn't asking for a lawsuit or money. I just wanted help to graduate.

Being turned away so many times made me feel like my pain was too complex to be worthy of help.

But finding a lawyer was not easy. Intake processes, paperwork, and bureaucracy felt overwhelming. I was terrified I would fail to explain my case clearly, that my English wouldn't be good enough, that my anxiety would make me sound incoherent, or that I'd be misunderstood. I was afraid of being dismissed—again. Finally, I reached K Altman Law.

Meanwhile, the week following my ER visit grew darker. I was eating and sleeping poorly, and my anxiety reached a new high. I began experiencing visual disturbances—a flashing white bar in my left eye, and soon after, shimmering halos in both eyes. I had more panic attacks. I started having suicidal thoughts. I felt absurd—who would care about justice or fairness at a place like OSU? I wasn't asking to win a case—I was just asking for the chance to complete a class fairly. I began thinking: maybe the only way anyone would listen was if I died.

Even as I was hospitalized, the university still emailed me a final exam notification on April 29—the exact day of the exam. Despite knowing I was in crisis, there was no pause, no reconsideration, no contact beyond logistics. I had already told the VC Fowler and Associate dean Martin that my condition made in-person exams dangerous. I even disclosed that I had been hospitalized at Harding Hospital after an exam in 2023. Before that, I had already submitted updated psychological records and physician notes to university leadership, including the board of OSU and the President's Office.

These documents detailed the risks I faced under standard exam conditions and explained why I was requesting an alternative format. Still, there was no meaningful response. The documentation was either ignored or dismissed, and I was once again redirected to people who

页 32

had no authority to implement accommodations.
Still, Professor Fowler and Assistant Dean Martin continued to insist that I take the final in-person, with students from other sections, in a traditional classroom setting.

I asked them directly—if something went wrong, would anyone call an ambulance? Would someone take responsibility if I collapsed? Instead, I was advised to contact CCS, the university's counseling service. But counseling cannot override a systemic refusal to provide accommodation. In that moment, I realized something deeply painful: even GPT, a machine, had shown more compassion than the people entrusted with my care. GPT didn't tell me to go back and ask someone else. It didn't delay, deflect, or ignore me. It simply said: "Call the hotline. You need help. You deserve to live."

That contrast broke me. Why was it that a chatbot showed more humanity than the university where I was trying to survive?

I searched for tall buildings in Columbus—courthouses, the Hilton, government towers—but couldn't access any of them. I felt helpless. I even considered overdosing by mixing my prescribed medication with painkillers. I asked GPT if that would be lethal, and it urged me to call the suicide hotline, warning that I might survive with permanent damage.

But I lived alone. No one could save me. I spiraled into painful memories—of hiding at OSU, wandering the library at night, leaving before dawn. I wanted to be seen, to have friends, to belong—but I was terrified. Even talking to classmates or walking into academic buildings triggered anxiety attacks. I felt completely lost. I couldn't die, and living was unbearable.

My symptoms worsened: fatigue, nausea, headaches, chest pain, purple flashes in my vision. I finally went back to the ER. When I shared what GPT had said, they rushed me to the critical care area. When I admitted I had suicidal thoughts, I was involuntarily hospitalized. Technically, I signed the consent, but I didn't know where I was

going. Once admitted, I begged my care team to let me leave—over and over—but they refused.

The good news is that I started improving. Medication helped me eat, sleep, and stop shaking. After six days—on April 30—I was discharged. But as soon as I returned home, I started trembling again. My legs shook in the bathroom. My hands twitched

involuntarily. I became terrified that I had suffered lasting damage. Even now, I continue taking medication daily, but I still experience sudden tremors in my hands and legs. I believe I have sustained irreversible harm. And emotionally, I now carry profound trauma and fear of institutional systems—systems that were supposed to support me.

I want to be clear: I know no system is perfect. Earlier this semester, there was a mistake in scheduling my SLDS quiz in another course, caused by the instructor's family emergency. I followed up several times but never reported the incident. I even forfeited the quiz because the assigned location triggered my symptoms. I understood it wasn't done out of malice. That instructor later ensured all exams were properly arranged and remained supportive.

I share this to show that I am not demanding perfection. I understand the human element in any system. I have tried to be patient, understanding, and cooperative. But the situation with MATH 4548 became unbearable—not because I didn't follow the rules, but because I did everything right. I applied, got approval, and reached out to multiple departments. Yet I was never given a way to complete the course.

I ask the Court to understand that my psychological deterioration is not a result of carelessness or lack of effort. It is the product of excessive academic demands, systemic opacity, and the prolonged denial of basic medical accommodations. I am not asking for an exemption—I am asking for the chance to complete the course in a manner consistent with university policy and my SLDS-approved accommodations.

I am a graduating senior who was originally expected to complete my degree in Spring 2025. On April 15, 2025, I experienced a medical emergency and was later hospitalized from April 24 to April 30. These events caused significant academic disruption and health deterioration. Despite repeated formal requests, the university failed to implement my approved disability accommodations. As a result, I am now at risk of being denied timely graduation.
In parallel, I have been admitted to a graduate program in mathematics and statistics at Georgetown University, which only admits students for Fall enrollment. My final transcript must be submitted by July 1, 2025. I currently hold an Incomplete in a required course, which must be resolved by June 15. A delay in graduation would cause a one-year deferment in my graduate education, loss of visa status, and long-term harm to my academic and

professional trajectory.

For me, this is not simply about academic scheduling. The Ohio State University is the physical and emotional locus of my trauma. I struggle with severe anxiety and social fear that make it nearly impossible to function as a "normal" student on campus. Walking into academic buildings—spaces where I experienced repeated humiliation, exclusion, and institutional neglect—triggers overwhelming psychological distress.

I want to be able to make friends, join student groups, study in the library like everyone else. But I can't. I only go to the library late at midnight when I know it's almost empty. I avoid campus during the day and instead find refuge in off-campus places like Easton, where I feel anonymous and less afraid. I don't know why the fear runs so deep—I just know it's real, and it controls me. Sometimes, at home, I find myself curled up under my blanket in broad daylight, trying to breathe through the terror.

Leaving this university isn't just about academics. It is a form of survival. It is the closing of a chapter defined by suffering, and the beginning of a life where I might finally recover. Denying me the ability to complete this final step remotely, safely, and with dignity would prolong a cycle of harm that I have spent years trying to escape.

Given the combination of institutional inaction, medical hardship, and the rapidly approaching deadlines, I have no viable option other than to pursue this matter remotely and on an expedited basis.

I began seeking assistance on April 2, when I first consulted my academic advisor regarding the barriers I was facing. On April 8, I formally submitted a written request for alternative completion to the Assistant Director of Undergraduate Studies. These actions were taken well in advance of final exams, and in full compliance with university policy. Yet, despite repeated follow-ups and documentation of medical need, no resolution was offered.

The harm I have endured is not the result of negligence on my part, but of the university's persistent refusal to take action—despite having ample time, notice, and authority to do so.

As a student registered with SLDS, I've come to recognize the quiet assumption placed on us — that we are fragile, incapable, or unreasonable. But the truth is, we are not. You don't know how many nights we've spent alone, trying to calm our panic, manage

页 35

our pain, and keep ourselves from falling apart — not because we gave up, but because no one answered.

What this system sees are numbers — grades, absences, forms. And maybe, based on that, some assume we aren't trying hard enough. But I want to say clearly: we strive. We are still here. We have made progress, even if it's not visible on a transcript. We measure ourselves against who we were yesterday, and by that measure, many of us are already succeeding.

We have a right to be here. We deserve to be treated fairly, with dignity. We are not asking for pity. We are asking to be seen — for the strength it takes to keep going.

As of the filing of this declaration, my official transcript for MATH 4548 shows a grade of 'Incomplete (I)', in accordance with the university's academic policy. I am actively seeking a lawful and accessible path to complete the course, as permitted under this designation. I am not asking for a guaranteed grade or a waiver. I am simply requesting an alternative way to complete the course — one that accounts for my documented needs. I may not pass, and I accept that. But I still deserve the opportunity to try. Just once, under conditions that are safe, fair, and lawful.

Plaintiff acknowledges the emotional nature of the attached Declaration. However, every factual representation contained therein is supported by contemporaneous documentation and reflects the lived reality of a student navigating a system that failed to respond to urgent disability-related needs. Plaintiff does not seek pity or special treatment, but a lawful opportunity to complete her degree with dignity and safety.